SK/DMP:JPL/FJN/NDB
F. #2019R00935 / OCDETF #NY-NYE-874H

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
\* JANUARY 27, 2023 \*
BROOKLYN OFFICE

Judge Dora Lizette Irizarry
Magistrate Judge Vera M. Scanlon

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

MOHAMMAD IBRAHIM BAZZI and
TALAL KHALIL CHAHINE,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. __23-CR-41_____

(T. 18, U.S.C., §§ 981(a)(1)(C),
982(a)(1), 982(b)(1), 1956(h), 3238
and 3551 et seq.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C., § 2461(c); T.
50, U.S.C., §§ 1705(a) and 1705(c))

THE GRAND JURY CHARGES:

At all times relevant to this Indictment, unless otherwise indicated:

INTRODUCTION

A. The Defendants and Relevant Individuals and Entities

1. The defendant MOHAMMAD IBRAHIM BAZZI was a dual Lebanese and Belgian citizen. Since on or about May 17, 2018, BAZZI has been publicly designated by the United States Department of the Treasury ("Treasury Department"), Office of Foreign Assets Control ("OFAC"), as a Specially Designated Global Terrorist ("SDGT") and has remained so designated at all times thereafter.

2. The defendant TALAL KHALIL CHAHINE was a dual United States and Lebanese citizen who, from in or about the late 1980s through approximately 2006, resided in Michigan. CHAHINE was the founder, owner and operator of Restaurant #1, an entity the identity of which is known to the Grand Jury, a Middle Eastern restaurant chain located throughout the Detroit, Michigan metropolitan area. In or about 2006, following and in

response to numerous personal- and business-related legal and financial problems, CHAHINE fled the United States and has since resided in Lebanon and elsewhere.

3. Co-Conspirator #1 ("CC-1"), an individual whose identity is known to the Grand Jury, was a United States citizen who resided in Michigan.

4. Hizballah was a foreign terrorist organization that, since the 1980s, engaged in numerous terrorist activities, including attacks against American military members, government employees and civilians abroad. These terrorist activities were part of Hizballah's broader anti-American and anti-Western campaigns.

5. On or about October 8, 1997, the United States Secretary of State designated Hizballah as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act. The designation included the following aliases: Party of God, Islamic Jihad, Islamic Jihad Organization, Revolutionary Justice Organization, Organization of the Oppressed on Earth, Islamic Jihad for the Liberation of Palestine, Organization of Right Against Wrong, Ansar Allah and Followers of the Prophet Muhammad.

6. On or about May 16, 2017, the Secretary of State amended the designation of Hizballah to include the following aliases: Lebanese Hizballah, also known as Lebanese Hezbollah, also known as LH; Foreign Relations Department, also known as FRD; and External Security Organization, also known as ESO, also known as Foreign Action Unit, also known as Hizballah ESO, also known as Hizballah International, also known as Special Operations Branch, also known as External Services Organization and also known as External Security Organization of Hezbollah. Hizballah remains a designated FTO.

B.      The International Emergency Economic Powers Act

7.      The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701 et seq., granted the President of the United States authority to deal with unusual and extraordinary threats to the national security, foreign policy and economy of the United States.  50 U.S.C. § 1701(a).  Pursuant to that authority, the President could declare a national emergency through Executive Orders that had the full force and effect of law.

8.      Pursuant to IEEPA, the President of the United States was authorized, among other things, to "investigate, regulate, or prohibit – (i) any transactions in foreign exchange, (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of a foreign country or national thereof, [and] (iii) the importing or exporting of currency or securities[.]"  50 U.S.C. § 1702(a)(1)(A).

9.      Also pursuant to IEEPA, the President had the authority to "block . . . any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]"  50 U.S.C. § 1702(a)(1)(B).

10.     On or about September 23, 2001, pursuant to IEEPA and other statutes, the President issued Executive Order 13224, titled, "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism," declaring a national emergency with respect to the threat to the national security, foreign policy and

economy of the United States posed by grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the September 11, 2001 attacks in New York, Pennsylvania and Virginia, and the continuing and immediate threat of further attacks on U.S. nationals or the United States.

11. Executive Order 13224, Section 1, stated, in relevant part:

> Except to the extent . . . provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, all property and interests in property of the following persons that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons are blocked:
>
> * * *
>
> (c) persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order;

Hizballah was listed in the Annex to Executive Order 13224.

12. Executive Order 13224, Section 2, stated:

> Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date:
>
> (a) any transaction or dealing by United States persons or within the United States in property or interests in property blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those

      persons listed in the Annex to this order or determined to be subject to this order;

      (b) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order is prohibited; and

      (c) any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

13.     On or about September 9, 2019, pursuant to IEEPA and other statutes, the President issued Executive Order 13886, titled, "Modernizing Sanctions to Combat Terrorism," thereby amending, among other things, Executive Order 13224, Section 1, effective September 10, 2019. Accordingly, Executive Order 13224, Section 1, as amended by Executive Order 13886, stated, in relevant part:

      (a) All property and interests in property that are in the United States, that hereinafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

      (i) persons listed in the Annex to this order;

      \* \* \*

      (iii) persons determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Secretary of Homeland Security, and the Attorney General:

      (A) to be owned, controlled, or directed by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person

whose property and interests in property are blocked pursuant to this order;

(B) to own or control, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order;

(C) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of . . . any person whose property and interests in property are blocked pursuant to this order;

\* \* \*

(F) to have attempted or conspired to engage in any of the activities described in subsections (a)(iii)(A) through (E) of this section;

\* \* \*

(c) The prohibitions in subsections (a) and (b) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order.

C.     Global Terrorism Sanctions Regulations

14.     Pursuant to IEEPA and Executive Order 13224, the Treasury Department, OFAC, subsequently promulgated the Global Terrorism Sanctions Regulations ("GTSR"), Title 31, Code of Federal Regulations, Part 594 et seq. Among other things, the GTSR provided:

(a)     "Except as authorized by statutes, regulations, orders, directives, rulings, instructions, licenses or otherwise . . . property and interests in property of [SDGTs] that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of U.S. persons, including their overseas branches, are blocked

and may not be transferred, paid, exported, withdrawn or otherwise dealt in . . . ." 31 C.F.R. § 594.201(a).

(b) "Except as otherwise authorized, no U.S. person may engage in any transaction or dealing in property or interests in property of persons whose property and interests in property are blocked pursuant to § 594.201(a), including but not limited to the . . . making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to § 594.201(a); and . . . [t]he receipt of any contribution or provision of funds, goods, or services from any person whose property and interests in property are blocked pursuant to § 594.201(a)." 31 C.F.R. § 594.204.

(c) "Except as otherwise authorized, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, any transaction by any U.S. person or within the United States on or after the effective date that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this part is prohibited." 31 C.F.R. § 594.205(a).

(d) "Except as otherwise authorized, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is prohibited." 31 C.F.R. § 594.205(b).

(e) The term "United States Person" or "U.S. Person" included U.S. Citizens and U.S. Permanent Residents regardless of where they live; all persons or entities within the United States; and all entities incorporated in the United States, including any foreign

branches or subsidiaries that are owned or controlled by U.S. entities. See 31 C.F.R. § 594.315; see also Executive Order 13224 § 3.

15. The defendant TALAL KHALIL CHAHINE and CC-1 were each a "U.S. Person" as defined in the GTSR.

## THE DEFENDANTS' CRIMINAL SCHEME

A. Background of the Defendants' Criminal Scheme

16. In or about 2006, the defendant TALAL KHALIL CHAHINE lost his ownership and control of the Restaurant #1 restaurant chain when he fled the United States and his investment in the Restaurant #1 restaurant chain was encumbered by liens or seized by the State of Michigan tax authorities.

17. Beginning in or about January 2007, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE, together with others, invested approximately $7 million to silently repurchase the Restaurant #1 restaurant chain and to resume its operations for profit (the "Secret Restaurant #1 Assets"). As part of their efforts, BAZZI and CHAHINE secretly purchased and established a headquarters and central food preparation facility in Dearborn, Michigan (the "Headquarters Facility").

18. The defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE concealed their investments in Restaurant #1 for the purpose of shielding their assets from creditors and potential creditors, including the United States Government and other state and local governmental authorities.

19. To conceal their interests, involvement and roles as silent investors, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE: (a) deposited and caused the deposit of funds into one or more bank accounts held in the names of others who,

in turn, used those funds to purchase one or more restaurants and properties, including the Headquarters Facility, on their behalf; (b) created, used and caused others to create and use specially-formed corporate entities purportedly unassociated with Restaurant #1 and the Restaurant #1 brand; (c) caused others to own and operate the Secret Restaurant #1 Assets on their behalf and for their benefit and to distribute profits to them; and (d) took other steps to ensure that their names were not associated with Restaurant #1's documentation including corporate and real estate filings.

B.  The Defendants' Criminal Conduct in Violation of IEEPA and GTSR

20. On or about May 17, 2018, the defendant MOHAMMAD IBRAHIM BAZZI was designated as an SDGT by the Treasury Department, OFAC, pursuant to IEEPA, Executive Order 13224 and the GTSR. According to a release issued by OFAC, BAZZI was designated pursuant to Executive Order 13224, Section 1(c), for acting for or on behalf of Hizballah, specifically, "for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Hizballah." Further according to the OFAC release, BAZZI "is a key Hizballah financier who has provided Hizballah financial assistance for many years and has provided millions of dollars to Hizballah generated from his business activities" in Belgium, Lebanon, Iraq and throughout West Africa.

21. As a result of the designation, the defendant MOHAMMAD IBRAHIM BAZZI's interests in any property in the United States, or in the possession or control of U.S. persons, including the Secret Restaurant #1 Assets and the Headquarters Facility, were blocked, and all U.S. persons were generally prohibited from transacting business with, or for the benefit of, BAZZI.

22. Subsequent to the defendant MOHAMMAD IBRAHIM BAZZI's designation as an SDGT, BAZZI and the defendant TALAL KHALIL CHAHINE, together with others, conspired and attempted to evade, avoid and violate the regulations, prohibitions and licensing requirements of IEEPA, Executive Order 13224 and the GTSR. BAZZI and CHAHINE sought to sell and liquidate their interests in the Secret Restaurant #1 Assets and the Headquarters Facility, transfer the funds and proceeds of the sales out of the United States and cause U.S. persons including CC-1 to do the same, despite the legal prohibitions against such transactions.

23. In or about October 2018, the Headquarters Facility was listed for sale. In anticipation of the sale of the Headquarters Facility, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE, together with CC-1, explored ways to transfer the proceeds of the sale to BAZZI and CHAHINE though one or more third parties, such that any such transfers would not be detected by the United States Government.

24. On or about October 19, 2018, the Headquarters Facility was sold for approximately $905,000. Over the next few days, the net proceeds of the sale, approximately $823,352.53 (the "Headquarters Facility Proceeds"), were wire transferred into one or more accounts at a United States-based bank (the "U.S. Bank #1"), an entity the identity of which is known to the Grand Jury.

25. On or about April 26, 2019, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE spoke via telephone about their plans to transfer the Headquarters Facility Proceeds outside the United States. This telephone call was placed from within the Eastern District of New York. During the conversation, BAZZI and CHAHINE described, in sum and substance and in part, three schemes for concealing the true nature,

destination and beneficiaries of the transfer by transferring the funds through: (a) a third party in China as part of a fictitious purchase of restaurant equipment from a Chinese manufacturer and supplier, and further concealed by causing the issuance of sham invoices and receipts; (b) a third party in Lebanon as part of a fictitious real estate purchase in Beirut, Lebanon; and (c) one or more of CHAHINE's family members in Kuwait and elsewhere as part of one or more fictitious intra-family loans.

26. In or about May 2019, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE discussed a fourth scheme for concealing the true nature, destination and beneficiaries of the transfer of the Headquarters Facility Proceeds. In sum and substance, the funds would be transferred from the United States to Lebanon as part of a fictitious franchising agreement as payment for the rights to operate a Lebanese-based restaurant chain throughout the United States.

27. On or about May 8, 2019, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE sent and caused to be sent an e-mail message to an individual located in the United States whose identity is known to the Grand Jury. The subject line of the e-mail read, "proforma invoi[c]e;" there was no text in the body of the message. The e-mail included a one-page attachment dated April 22, 2019 (the "Pro Forma Invoice"), which was purportedly issued by a Beirut, Lebanon-based company (the "Lebanese Company"). The Pro Forma Invoice purported to be an invoice for $860,000 in "Entrance Fee[s]" for 25 "Branches" located in New York, Michigan, Washington and elsewhere throughout the United States. The purported terms of sale stated: "The Payment of 860,000$ to be transferred to [the Lebanese Company] bank account upon signature of main contract." The Pro Forma Invoice

also provided purported banking information for a Lebanon-based bank account, including a bank identifier code and international bank account number.

28.     On or about May 14, 2019, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE sent and caused to be sent another e-mail message to an individual located in the United States whose identity is known to the Grand Jury. The subject line of the e-mail message read "agreement" and attached to the e-mail message was a 27-page purported "Franchise and Development Agreement," (the "Purported Franchise Agreement"), for a subsidiary of the Lebanese Company (the "Lebanese Company-Subsidiary"). The Purported Franchise Agreement asserted that the Lebanese Company-Subsidiary "brand . . . offers a variety of Mediterranean authentic food and meals, as well as a wide selection of special oriental spices." The Purported Franchise Agreement further purported to grant rights "to operate an authorized master franchisee position for [the Lebanese Company-Subsidiary] in the United States of America territory," and "to develop a specified number of [the Lebanese Company-Subsidiary] Stores within a defined geographic area," which corresponded to the 25 "Branches" referred to in the Pro Forma Invoice. The Purported Franchise Agreement also stated that, "[a]s consideration for the rights granted herein," $860,000 would be paid as a "Development Fee [that] is not refundable under any circumstances."

29.     On or about May 14, 2019, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE mailed and caused to be mailed two signed hardcopies of the Purported Franchise Agreement from Lebanon to an individual located in the United States whose identity is known to the Grand Jury.

30. On or about May 20, 2019, the hardcopy Purported Franchise Agreements arrived from Lebanon to an international mail facility located within the Eastern District of New York.

31. On or about May 22, 2019, the hardcopy Purported Franchise Agreements departed the international mail facility located within the Eastern District of New York and were ultimately delivered as addressed to a location in Michigan.

32. Since in or about May 2019, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE have continued their efforts to transfer, export and withdraw their property and interests in property, and cause one or more U.S. persons, including CC-1, to do the same without obtaining the required licenses from the Treasury Department. As part and in furtherance of these efforts, BAZZI and CHAHINE have continued to communicate with one or more U.S. persons, including CC-1, via: (a) text message and other forms of electronic communication; (b) telephone calls; and (c) written correspondence.

COUNT ONE
(Conspiracy to Conduct Unlawful Transactions Involving
a Specially Designated Global Terrorist)

33. The allegations contained in paragraphs one through 32 are realleged and incorporated as if fully set forth in this paragraph.

34. In or about and between May 2018 and January 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE, together with others, did knowingly and willfully conspire to violate, and to cause a violation of, one or more licenses, orders, regulations and prohibitions issued under IEEPA, contrary to IEEPA, Title 50,

United States Code, Sections 1701 et seq.; the GTSR, Title 31, Code of Federal Regulations, Part 594 et seq.; and Executive Orders 13224 and 13886.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United States Code, Sections 3238 and 3551 et seq.).

## COUNT TWO
(Attempt to Conduct Unlawful Transactions Involving
a Specially Designated Global Terrorist)

35. The allegations contained in paragraphs one through 32 are realleged and incorporated as if fully set forth in this paragraph.

36. In or about and between May 2018 and January 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE, together with others, did knowingly and willfully attempt to violate, and to cause a violation of, one or more licenses, orders, regulations and prohibitions issued under IEEPA, contrary to IEEPA, Title 50, United States Code, Sections 1701 et seq.; the GTSR, Title 31, Code of Federal Regulations, Part 594 et seq.; and Executive Orders 13224 and 13886.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United States Code, Sections 3238 and 3551 et seq.).

## COUNT THREE
(Money Laundering Conspiracy)

37. The allegations contained in paragraphs one through 32 are realleged and incorporated as if fully set forth in this paragraph.

38. In or about and between May 2018 and January 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

15

defendants MOHAMMAD IBRAHIM BAZZI and TALAL KHALIL CHAHINE, together with others, did knowingly and intentionally conspire to:

        (a)    conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency and the transfer and sale of title to real property, to wit: the Headquarters Facility, which transactions in fact involved the proceeds of specified unlawful activity, to wit: offenses under IEEPA, in violation of Title 50, United States Code, Section 1705 (the "Specified Unlawful Activity"), knowing that the property involved in such financial transactions represented the proceeds of some form of illegal activity, (i) with the intent to promote the carrying on of such Specified Unlawful Activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i), and (ii) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of such Specified Unlawful Activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); and

        (b)    transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States, to wit: China and Lebanon, (i) with the intent to promote the carrying on of the Specified Unlawful Activity, contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (ii) knowing that the monetary instruments and funds involved in the transportation, transmissions and transfers represented the proceeds of some form of unlawful activity and that such transportation, transmissions and transfers were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of

such Specified Unlawful Activity, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h), 3238 and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS ONE AND TWO

39. The United States hereby gives notice to the defendants that upon their conviction of either of the offenses charged in Counts One and Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses, including but not limited to: (a) Eight Hundred Twenty Seven Thousand, Six Hundred and Ninety-Five Dollars and Eighty Four Cents ($827,695.84), and any and all accrued interest, formerly on deposit in U.S. Bank #1 Account No. 01893565780, and all proceeds traceable thereto; and (b) Eight Hundred Thirty Three Dollars and Four Cents ($833.04), and any and all accrued interest, formerly on deposit in U.S. Bank #1 Account No. 01382806536, and all proceeds traceable thereto.

40. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c)).

### CRIMINAL FORFETIURE ALLEGATION AS TO COUNT THREE

41. The United States hereby gives notice to the defendants that upon of their conviction of the offense charged in Count Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to: (a) Eight Hundred Twenty Seven Thousand, Six Hundred and Ninety-Five Dollars and Eighty Four Cents ($827,695.84), and any and all accrued interest, formerly on deposit in U.S. Bank #1 Account No. 01893565780, and all proceeds traceable thereto; and (b) Eight Hundred Thirty Three Dollars and Four Cents ($833.04), and any and all accrued interest, formerly on deposit in U.S. Bank #1 Account No. 01382806536, and all proceeds traceable thereto.

42. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

18

      (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

      (Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p)).

A TRUE BILL

_____
FOREPERSON

_____
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. #2019R00935 / OCDETF #NY-NYE-874H

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

vs.

MOHAMMAD IBRAHIM BAZZI and
TALAL KHALIL CHAHINE,

Defendants.

# INDICTMENT

(T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1), 982(b)(1), 1956(h), 3238 and 3551 et seq.; T. 21, U.S.C. § 853(p); T. 28, U.S.C. § 2461(c); T. 50, U.S.C., §§ 1705(a) and 1705(c))

*A true bill.*

_____
*Foreperson*

Filed in open court this _____ day,

of _____ A.D. 20 _____       _____
                                              *Clerk*

Bail, $ _____

Jonathan P. Lax, Francisco J. Navarro and Nomi D. Berenson
*Assistant U.S. Attorneys (718) 254-7000*