

U.S. Department of Justice

United States Attorney
Eastern District of New York

FJN:RMP/NDB/JPL
F. #2019R00935/OCDETF #NY-NYE-874H

271 Cadman Plaza East
Brooklyn, New York 11201

February 25, 2025

By Hand and E-mail

**FILED PARTIALLY UNDER SEAL**

The Honorable Dora L. Irizarry
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Mohammad Ibrahim Bazzi
                Criminal Docket No. 23-041 (DLI)

Dear Judge Irizarry:

      The government respectfully submits this letter in advance of the sentencing of the defendant Mohammad Ibrahim Bazzi, which is scheduled for March 12, 2025 at 11:30 a.m. For the reasons set forth below, a sentence within the advisory Guidelines range of 37 to 46 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing.

I.    Factual Background

      The defendant is a dual Lebanese and Belgian citizen. PSR ¶ 3. In May 2018, the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), designated the defendant as a Specially Designated Global Terrorist ("SDGT") "for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Hizballah," which is a designated foreign terrorist organization. PSR ¶ 3, 19.[1] According to the public OFAC designation, the defendant "is a key Hizballah financier who has provided Hizballah financial assistance for many years and has provided millions of dollars to Hizballah generated from his business activities" in Belgium, Lebanon, Iraq and

---

[1] Hizballah is a foreign terrorist organization that, since the 1980s, has engaged in numerous terrorist activities, including attacks against American military members, government employees, and civilians abroad. These terrorist activities are part of Hizballah's broader anti-American and anti-Western campaigns. On October 8, 1997, the United States Secretary of State designated Hizballah as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act. PSR ¶ 6-8.

throughout West Africa. As a result of the designation, the defendant's interests in any property in the United States, or in the possession or control of U.S. persons were blocked. PSR ¶ 19.

Co-defendant Talal Khalil Chahine was the founder, owner, and operator of Restaurant #1, a Middle Eastern restaurant chain located throughout the Detroit, Michigan metropolitan area. PSR ¶ 4. On May 18, 2006, a grand jury in the Eastern District of Michigan charged Chahine with four counts of income tax evasion, in violation of Title 26, United States Code, Section 7201. See United States v. Talal Chahine, et al., 06-CR-20248 (SFC) (E.D. Mich.). In 2006, in connection with this indictment, Chahine fled from the United States to Lebanon.[2] PSR¶ 4. Beginning in or about January 2007, prior to the defendant's designation as an SDGT, the defendant and Chahine, together with others, invested approximately $7 million to silently repurchase the Restaurant #1 chain, and to resume its operations for profit (the "Secret Restaurant #1 Assets"). As part of their efforts, the defendant and Chahine secretly purchased and established a headquarters and central food preparation facility in Dearborn, Michigan (the "Headquarters Facility"). PSR ¶ 17.

The defendant and Chahine concealed their investments in Restaurant #1 for the purpose of shielding their assets from creditors and potential creditors, including the United States government and other state and local governmental authorities. To conceal their interests, involvement, and roles as silent investors, the defendant and Chahine: (a) deposited and caused the deposit of funds into one or more bank accounts held in the names of others who, in turn, used those funds to purchase one or more restaurants and properties, including the Headquarters Facility, on their behalf; (b) created, used, and caused others to create and use specially-formed corporate entities purportedly unassociated with Restaurant #1 and the Restaurant #1 brand; (c) caused others to own and operate the Secret Restaurant #1 Assets on their behalf and for their benefit and to distribute profits to them; and (d) took other steps to ensure that their names were not associated with Restaurant #1's documentation including corporate and real estate filings. PSR¶ 18.

After the defendant was designated as an SDGT, the defendant and Chahine conspired and attempted to evade, avoid, and violate the regulations, prohibitions, and licensing requirements associated with the designation. PSR ¶ 21. Specifically, the defendant and Chahine sought to sell and liquidate their interests in the Secret Restaurant #1 Assets and the Headquarters Facility, transfer the funds and proceeds of the sales out of the United States and cause U.S. persons to do the same, despite the legal prohibitions against such transactions. Id.

---

[2] Chahine was also subsequently charged in two additional indictments filed in the Eastern District of Michigan. The first indictment was filed in connection with a bribery and extortion conspiracy in which federal immigration benefits were awarded to illegal aliens in exchange for money, see United States v. Talal Chahine, et al., 07-CR-20327 (AJT) (E.D. Mich.), and (ii) a marriage and naturalization fraud scheme involving a former employee turned corrupt federal government official, see United States v. Talal Chahine, et al., 07-CR-20156 (AC) (E.D. Mich.). Chahine remains a fugitive from justice in all three cases. Additionally, in the later indictment, although Chahine is not an SDGT, he was identified as having ties to Hizballah.

2

In October 2018, the Headquarters Facility was listed for sale. In anticipation of the sale of the Headquarters Facility, the defendant and Chahine explored ways to transfer the proceeds of the sale to them in Lebanon through one or more third parties so that the transfers would not be detected by the United States government. PSR ¶ 22. On October 19, 2018, the Headquarters Facility was sold for approximately $905,000. Over the next few days, the net proceeds of the sale—approximately $823,352.53 (the "Headquarters Facility Proceeds")—were wire transferred into one or more accounts at a United States-based bank (the "U.S. Bank #1"). Id. On April 26, 2019, the defendant and Chahine spoke via telephone about their plans to transfer the Headquarters Facility Proceeds outside the United States. PSR ¶ 23. During the conversation, the defendant and Chahine described three schemes for concealing the true nature, destination, and beneficiaries of the transfer by transferring the funds through: (a) a third party in China as part of a fictitious purchase of restaurant equipment from a Chinese manufacturer and supplier, and further concealed by causing the issuance of sham invoices and receipts; (b) a third party in Lebanon as part of a fictitious real estate purchase in Beirut, Lebanon; and (c) one or more of Chahine's family members in Kuwait and elsewhere as part of one or more fictitious intra-family loans. Id.

In May 2019, the defendant and Chahine discussed a fourth scheme for concealing the true nature, destination and beneficiaries of the transfer of the Headquarters Facility Proceeds. In short, the funds would be transferred from the United States to Lebanon as part of a fictitious franchising agreement as payment for the rights to operate a Lebanese-based restaurant chain throughout the United States. PSR ¶ 24. On May 8, 2019, the defendant and Chahine sent an e-mail message to an individual located in the United States. PSR ¶ 25. The subject line of the e-mail read, "proforma invoi[c]e;" there was no text in the body of the message. Id. The e-mail included a one-page attachment dated April 22, 2019 (the "Pro Forma Invoice"), which was purportedly issued by a Beirut, Lebanon-based company (the "Lebanese Company"). Id. The Pro Forma Invoice purported to be an invoice for $860,000 in "Entrance Fee[s]" for 25 "Branches" located in New York, Michigan, Washington, and elsewhere throughout the United States. Id. The purported terms of sale stated: "The Payment of 860,000$ to be transferred to [the Lebanese Company] bank account upon signature of main contract." Id. The Pro Forma Invoice also provided purported banking information for a Lebanon-based bank account, including a bank identifier code and international bank account number. Id. The Pro Forma Invoice was fictitious and designed to further the illegal scheme.

On May 14, 2019, the defendant and Chahine sent another e-mail message to an individual located in the United States. The subject line of the e-mail message read "agreement" and attached to the e-mail message was a 27-page purported "Franchise and Development Agreement," (the "Purported Franchise Agreement"), for a subsidiary of the Lebanese Company (the "Lebanese Company-Subsidiary"). PSR ¶ 26. The Purported Franchise Agreement asserted that the Lebanese Company-Subsidiary "brand . . . offers a variety of Mediterranean authentic food and meals, as well as a wide selection of special oriental spices." Id. The Purported Franchise Agreement further purported to grant rights "to operate an authorized master franchisee position for [the Lebanese Company-Subsidiary] in the United States of America territory," and "to develop a specified number of [the Lebanese Company-Subsidiary] Stores within a defined geographic area," which corresponded to the 25 "Branches" referred to in the Pro Forma Invoice. Id. The Purported Franchise Agreement also stated that, "[a]s consideration

3

for the rights granted herein," $860,000 would be paid as a "Development Fee [that] is not refundable under any circumstances." Id. The Purported Franchise Agreement, like the Pro Forma Invoice, was fictitious and also designed to further the illegal scheme.

On May 14, 2019, the defendant and Chahine mailed two signed hardcopies of the Purported Franchise Agreement from Lebanon to an individual located in the United States. PSR ¶ 26. The defendant and Chahine thereafter continued their efforts to transfer, export, and withdraw their property and interests in property, and caused one or more U.S. persons to do the same without obtaining the required licenses from the Treasury Department. PSR ¶ 28.

II.     Procedural History

On January 27, 2023, a grand jury sitting in the Eastern District of New York returned an Indictment charging the defendant with three counts. The Indictment charges the defendant in Count One with conspiracy to conduct unlawful transactions involving a Specially Designated Global Terrorist, in violation of Title 50, United States Code, Sections 1705(a) and 1705(c). Count Two charges the defendant with attempt to conduct unlawful transactions involving a Specially Designated Global Terrorist, in violation of Title 50, United States Code, sections 1705(a) and 1705(c). Count Three charges the defendant with money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h). See PSR ¶¶ 1-47.

On February 24, 2023, Romanian law enforcement arrested the defendant in Bucharest, Romania after he arrived there on a trip from Lebanon. PSR ¶ 29. On April 26, 2023, Romania extradited the defendant to the United States. Id. On April 26, 2023, the defendant was arraigned before the Honorable Peggy Kuo, United States Magistrate Judge for the Eastern District of New York. See ECF 23-CR-41 Dkt. No. 8. Judge Kuo entered a permanent order of detention and, since that time, the defendant has been incarcerated, first at the Metropolitan Detention Center in Brooklyn, New York, and later at the Hudson County Correctional Center in Kearny, New Jersey.

On September 20, 2024, the defendant pled guilty before Your Honor pursuant to a plea agreement (the "Plea Agreement"). Specifically, the defendant pled guilty to Count One of the Indictment, charging the defendant with conspiracy to conduct unlawful transactions involving a Specially Designated Global Terrorist, which carries a maximum term of 20 years' imprisonment. See PSR ¶ 75.

III.    Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is

different from the ordinary situation covered by the [G]uidelines calculation." United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original) (superseded by statute on other grounds). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." United States v. Aldeen, 792 F.3d 247, 251-52 (2d Cir. 2015), as amended (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)) (superseded by statute on other grounds).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; [and]
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding regarding the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

IV.    The Sentencing Guidelines

The government agrees with the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") calculation set forth in the PSR, which yields a total combined offense level of 21, Criminal History Category I, and an applicable Guidelines range of 37 to 46 months' imprisonment, as set forth below. See PSR ¶¶ 36-45.

5

<u>Conspiracy to Conduct Unlawful Transactions Involving a Specially Designated Global Terrorist</u>

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2M5.3(a)) | 26 |
| Subtotal: | <u>26</u> |

The defendant receives a reduction of three points for acceptance of responsibility, resulting in a total adjusted offense level of 23. <u>Id.</u> ¶ 42-43. The defendant meets the criteria for Zero-Point Offender, and the offense level is reduced by two levels, resulting in a total adjusted offense level of 21. U.S.S.G. § 4C1.1(a) and (b); PSR ¶ 44. The defendant stipulated to the Guidelines calculation. Plea Agreement ¶ 2.

V.     <u>Discussion</u>

The government respectfully seeks a sentence of 37 to 46 months' imprisonment. As set forth below, consideration of the factors set forth in Title 18, United States Code, Section 3553(a) warrants such a sentence.

　　A.　　<u>Nature and Circumstances of the Offense, and History and Characteristics of the Defendant</u>

As an initial matter, the "nature and circumstances of the offense" are serious. The circumventing of United States sanctions impacts the broader U.S. financial system and U.S. national security. Financial institutions are the gateway into the U.S. financial system for everyone from law abiding consumers and businesses to criminals engaged in illicit activity. U.S. sanctions ensure the security of the public by restricting the ability of terrorists and their organizations to obtain funds that can be used to carry out criminal activity. Moreover, those sanctions ensure the security and integrity of the broader U.S. financial system and ensure that those institutions are not exploited for terroristic ends.

In this case, the defendant was fully aware that he had been designated as an SDGT. Nevertheless, the defendant devised and executed a sophisticated plan to sell the Secret Restaurant #1 Assets and then have the proceeds illegally transferred to him and Chahine (a known fugitive from U.S. justice) in Lebanon. To carry out the scheme, the defendant concocted various fake transactions that were backstopped by fake paperwork and invoices designed to fool anyone who might be watching. This scheme is particularly concerning given OFAC's designation of the defendant as a significant financier for a designated foreign terrorist organization. Put simply, organizations like Hizballah rely on people like the defendant to evade U.S. sanctions and provide them with the means to continue terrorist activity.

Unfortunately for the defendant, he did not realize that the government was lawfully monitoring his communications and that those communications laid bare his illegal scheme. Indeed, but for that monitoring, the defendant's scheme may have succeeded and nearly $1 million of proceeds would have been illegally transferred to him and a U.S. fugitive in Lebanon—money that could have been diverted to Hizballah.

The defendant has no criminal history and his crime did not involve violence. However, a significant custodial sentence reflects the defendant's role in the full scope of this serious scheme: from conceiving of the deceptive plans, to creating the fake documents, and the willful attempt to follow through with illicit efforts to evade U.S. sanctions. Accordingly, the requested sentence appropriately reflects both the nature and circumstances of the offense, and the defendant's history and characteristics.

B.      Specific and General Deterrence

There is a need for both specific and general deterrence in this case. As to specific deterrence, a significant sentence is necessary to convey to the defendant that the potential financial incentive of this criminal activity is outweighed by the significant consequences brought upon those who are caught. If the defendant were to receive a lenient sentence, then he may calculate that future financial rewards were worth the risk, and there is a significant chance that he will resume trying to expatriate funds from the United States to Lebanon or elsewhere.

Finally, there is a need for general deterrence. General deterrence is necessary to make sure that illicit funds do not end up in the hands of individuals who can, in turn, provide them to designated foreign terrorist organizations. A significant sentence will deter others who may likewise seek to disregard legal requirements designed to protect the U.S. financial system, financial institutions, and U.S. national security. A significant sentence will send a powerful message to each link in the chain and warn them that participating in sanctions evasion will result in imprisonment and other consequences. Indeed, even individuals and entities who may not have been aware that their conduct violated the law are more likely to engage in rigorous review of transactions if they know that their failure to do so may result in serious criminal consequences.





8

VI.     Conclusion

For the reasons set forth above, the government respectfully submits that, based on the factors set forth in Section 3553(a), a sentence of 37 to 46 months' imprisonment is reasonable and appropriate in this case.

Respectfully submitted,

JOHN J. DURHAM
United States Attorney

By: _____
Francisco J. Navarro
Robert M. Pollack
Jonathan P. Lax
Nomi D. Berenson
Assistant United States Attorneys
(718) 254-7000

cc:     James M. Branden, Esq. (by e-mail)
        Senior United States Probation Officer Jennifer E. Baumann (by e-mail)

9